**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISON**

| | | |
|---|---|---|
| **EQUITRANS, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. _2:26-cv-1620_____ |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DAVID W. SUNDAY, Jr., in his official** | ) | |
| **capacity as Attorney General of** | ) | |
| **Pennsylvania; and** | ) | |
| **JESSICA SHIRLEY, in her official** | ) | |
| **capacity as Secretary of Department of** | ) | |
| **Environmental Protection** | ) | |

## COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF

### INTRODUCTION

1.      This action challenges the Defendants' intrusion into an interstate gas pipeline facility that is exclusively subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act, 515 U.S.C. §§ 717 et seq. and the Pipeline and Hazardous Materials Safety Administration ("PHMSA") under the Pipeline Safety Act, 49 U.S.C. § 60101 et seq. (the "PSA"). The safety standards for interstate gas pipeline facilities, like Well #2244 here, are exclusively set and regulated by PHMSA. 49 U.S.C. § 60101, et seq. and 49 C.F.R. Part 192. Congress has made clear through an express preemption provision that precludes states, including the Commonwealth, from adopting or enforcing their own safety standards for interstate pipeline facilities or transportation. *See* 49 U.S.C. § 60104(c) (Preemption).

2.    The Commonwealth's criminal charges against Equitrans under 25 Pa. Code § 78.73(a) defy that exclusive preemption provision and, thus, are in direct conflict with the federal PSA.[1]

3.    Courts of other jurisdictions have found that state laws are preempted in similar contexts. *See, e.g. Colorado Interstate Gas Co. v. Wright*, 707 F. Supp. 2d 1169 (D. Kan. 2010); *United Gas Pipeline Co. v. Terrebonne Par. Police Jury,* 319 F. Supp. 1138 (E.D. La. 1970), *aff'd sub nom.* 445 F.2d 301 (5th Cir. 1971); *ANR Pipeline Co. v. Iowa State Commerce Commission*, 828 F.2d 465 (8th Cir. 1987); and *Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 669 (8th Cir. 2025).

4.    As such, Equitrans is entitled to declaratory and injunctive relief to prevent those individually named Defendants herein from enforcing a preempted state regulation – namely Section 78.73(a).

5.    Enforcement of this preempted state regulation threatens immediate and irreparable harm to Equitrans and the customers it serves, which includes, but is not limited to, potential criminal liability, economic hardship, impairment of existing business relationships, and a loss of goodwill.  This is also the second state criminal matter brought by the Commonwealth – through the Defendants – involving Equitrans' purported violation of Chapter 78 of Title 25 of the Pennsylvania Code where the criminal charge is premised upon a preempted regulation.  And all the while, Equitrans has already entered into two Consent Orders with its federal regulator, PHMSA, relating to the incident and the same issues involved in the state criminal proceeding.

6.    For these reasons, and those as set forth more fully herein, Equitrans also seeks a preliminary injunction to avoid immediate and irreparable harm that would result from the unlawful acts of Defendants.

---

[1] 25 Pa. Code § 78.73 establishes standards specific to Pennsylvania relating to the construction and operation of oil and gas wells.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 since it arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether 25 Pa. Code § 78.73(a) – a state regulation purporting to mandate safety standards for well construction and maintenance – is preempted by the PSA where Congress has made clear, through an express preemption provision, that states – like the Commonwealth of Pennsylvania – cannot adopt or enforce their own safety standards for interstate pipeline facilities or transportation. *See* 49 U.S.C. § 60104(c) (*Preemption*).

8.     The Eleventh Amendment imposes no bar to this Court's jurisdiction for prospective declaratory and injunctive relief against the state officials named herein. *See Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (the Eleventh Amendment does not bar "suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law.")

9.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The individual Defendants perform their duties and thus reside in this District. A substantial part of the events giving rise to this action occurred in this District.

**PARTIES**

10.     Plaintiff, Equitrans, L.P. ("Equitrans"), is a registered Pennsylvania Domestic Limited Partnership with a principal place of business at 2200 Energy Drive, Canonsburg, PA 15317.

11.     Equitrans is a "natural gas company" – as defined by § 2(6) of the federal Natural Gas Act ("NGA"), 15 U.S.C. § 717a(6) – that is engaged in the business of storing and transporting natural gas in interstate commerce and, as such, is subject to the jurisdiction of FERC.

12.     Equitrans is comprised of interstate and intrastate pipelines that transport natural gas from Pennsylvania, West Virginia and Ohio to end-users and other pipeline systems in Appalachia.  As part of that process, Equitrans operates underground natural gas storage facilities that are regulated by PHMSA, including Well #2244.

13.     Defendant, David W. Sunday, Jr., is sued in his official capacity as the Attorney General for the Commonwealth of Pennsylvania.

14.     Defendant, Jessica Shirley, is sued in her official capacity as the Secretary for the Department of Environmental Protection for the Commonwealth of Pennsylvania.

## FACTUAL ALLEGATIONS

### A.     The Rager Mountain Gas Storage Field

15.     The Rager Mountain Gas Storage Field (the "Rager Mountain Facility") is a FERC-certificated and regulated depleted reservoir storage field in Cambria County into which natural gas is injected for storage primarily during the injection season (typically during the warm part of the year) and from which gas is removed primarily during the withdrawal season (typically during the cooler and cold parts of the year) for additional transportation to downstream customers for residential, commercial, and industrial use.

16.     In 1971, the field was converted from a conventional gas production field to a gas storage field.

17.     The Rager Mountain Facility was operated by another company from 1965 to 2013. Equitrans acquired the Rager Mountain Facility in 2013 and has operated it since.

18.     The storage field consists of 12 wells, including 2 observation wells used for the temporary storage of natural gas and 10 injection and withdrawal wells.

4

19.     Equitrans transports natural gas withdrawn from the Rager Mountain Facility through FERC-regulated interstate pipelines for customers including, among others, local distribution companies that serve significant areas of Westmoreland, Armstrong, Allegheny, Washington, and Greene counties in Pennsylvania.

20.     The Rager Mountain Facility itself and the gas wells at the Rager Mountain Facility constitute an interstate underground natural gas storage facility ("UNGSF").

21.     The Rager Mountain Facility is subject to the jurisdiction of PHMSA under the PSA.

22.     PHMSA implements the PSA as it relates to the Rager Mountain Facility.

23.     As set forth more fully herein, PHMSA has promulgated comprehensive safety standards for federally regulated interstate UNGSFs – like the Rager Mountain Facility – and interstate pipeline facilities at 49 C.F.R. Parts 190, 191, 192, and 199.

24.     Equitrans has included the Rager Mountain Facility in its annual reports to PHMSA since 2013.

25.     Before the November 6, 2022 incident, PHMSA had last inspected the Rager Mountain Facility on May 9-11, 2022 and May 18, 2022. PHMSA also inspected Equitrans' emissions procedures on June 16, 2022. PHMSA's inspection reports did not identify any well integrity issues.

26.     Notably, on October 26, 2022 (less than two weeks before the incident), Equitrans facilitated an annual inspection of Rager Mountain Facility wells by the Department of Environmental Protection (the "DEP") in furtherance of its efforts to work with federal and state agencies.  No concerns were identified.

## B.    The November 6, 2022 Incident

27.    At approximately 3:28 p.m. on Sunday, November 6, 2022, Equitrans was notified of a potential issue at its Rager Mountain Facility. Equitrans personnel arrived on scene at approximately 4:15 p.m. and found unintentional gas escaping from Well #2244 (also known as the George Reade 1 well).

28.    Equitrans reported the November 6, 2022 release to the National Response Center at 5:03 p.m., as required by 49 C.F.R. § 191.5, and to the DEP that same day at 5:17 p.m.  Equitrans also filed a supplemental telephonic notice to the National Response Center, as required by 49 C.F.R. § 191.5(c), on November 9, 2022.

29.    Equitrans further informed FERC orally and via letter dated November 7, 2022 of the incident and potential impacts on service deliverability.

30.    Equitrans and its contractors immediately began implementing steps on November 6 to stop the venting of gas.

31.    Equitrans and its contractor, CUDD Well Services, worked tirelessly after notification of the incident on November 6 to stop the release, carrying out those steps until their efforts were successful.

32.    Throughout the ensuing days, Equitrans and the well control team made numerous attempts to kill Well #2244.

33.    The first kill attempt occurred on November 11, 2022, using fresh water, which tagged (identified) a shallow obstruction in the well.

34.    The second kill attempt occurred on November 14, 2022 using 2 inch outside diameter ("OD") coil tubing ("CT") – the only coil tubing available at the time. This attempt also proved unsuccessful.

35.     The next attempt occurred on November 17, 2022 using a 2 3/8 inch CT. While this attempt was initially successful, the well eventually began consuming more fluid than was available to pump downhole (into the well) and ultimately gas started flowing again.

36.     The final, successful, attempt occurred on November 19, 2022 using the 2 3/8 inch CT. An isolation plug was set once the gas flow from the well was fully controlled.

37.     On November 20, 2022, Equitrans set a second plug in the well, and as an added precaution, pumped approximately 250 feet of cement into the wellbore above the upper plug.

38.     Throughout the course of these events, PHMSA representatives were on scene at the Rager Mountain Facility on November 9-11 and November 18-20, 2022, and January 11-12, 2023.

39.     Equitrans also kept PHMSA notified of all steps taken to address Well #2244.

### C.     <u>Criminal Proceeding</u>

40.     Following the incident, the Office of Attorney General convened the Fifty-First Statewide Grand Jury, which issued Presentment No. 25 and on April 24, 2025, the Supervising Judge accepted the presentment. *See attached as **Exhibit "A"** the Order Accepting Presentment No. 25 and Presentment No. 25.*

41.     The Grand Jury recommended the following charges against Equitrans:

   a. Unlawful Conduct Under the Air Pollution Control Act, 35 P.S. Section 4008 for the contamination of the air of the Commonwealth with methane and other VOCs; and

   b. Unlawful Conduct under the Clean Streams Law 35, P.S. Sections 691.611, 691.301, and 691.401 for contamination of the ground and waters of the Commonwealth with brine.

*See* Ex. A, p. 44.

42.     On July 24, 2025, a Criminal Complaint was filed charging Equitrans with:

   a. 14 counts of 35 P.S. § 4008 (Air Pollution Control Act, Unlawful Conduct);

    b.  1 count of 35 P.S. § 691.301 (Clean Streams Law, Prohibition Against Discharge of Industrial Wastes);

    c.  1 count of 35 P.S. § 691.401 (Clean Streams Law, Prohibitions Against Other Pollutions); and

    d.  1 count of 35 P.S. § 691.611 (Clean Streams Law, Unlawful Conduct).

*See attached as **Exhibit "B"** the Criminal Complaint.*

43.    Notably, there is no mention of 25 Pa. Code § 78.73(a) in the Presentment or the Criminal Complaint.

44.    A Preliminary Hearing was subsequently held on April 15 and April 16, 2026.

45.    At the conclusion of the Preliminary Hearing, the Magisterial District Judge transferred the case to the Court of Common Pleas of Cambria County for further processing.

46.    At no time before, during, or at the conclusion of the Preliminary Hearing did the Office of Attorney General reference 25 Pa. Code § 78.73(a).

47.    After the Preliminary Hearing, on April 16, Equitrans entered a plea of "not guilty" and waived formal arraignment.

48.    On April 27, 2026, the Commonwealth, through Defendants, filed an Information alleging:[2]

    a.  **Counts 1-14**: 35 P.S. § 4008 (Air Pollution Control Act, Unlawful Conduct);

    b.  **Count 15**: 35 P.S. § 691.301 (Clean Streams Law, Prohibition Against Discharge of Industrial Wastes);

    c.  **Count 16**: 35 P.S. § 691.401 (Clean Streams Law, Prohibitions Against Other Pollutions); and

    d.  **Count 17**: 35 P.S. § 691.611 (Clean Streams Law, Unlawful Conduct).

---

[2] The Information was filed in Cambria County, Pennsylvania and the case is docketed at CP-11-CR-000385-2026.

*See attached as **Exhibit "C"** the Information.*

49.      Specifically, Count 17 of the Information alleges that Equitrans "negligently violate[d] 25 Pa. Code 78.73(a) and caused water pollution, when it discharged brine water into the wetlands and groundwater…" *See* Ex. C, at Count 17.

50.      This is the first time that any alleged violations under 25 Pa. Code § 78.73(a) were raised.

**D.      Consent Orders with PHMSA**

51.      On December 29, 2022, pursuant to 49 C.F.R. § 190.239, PHMSA issued a Notice of Proposed Safety Order ("NOPSO") to "take certain measures with respect to [the Rager Mountain Facility] to ensure safety" regarding the November 6, 2022 incident.

52.      The NOPSO alleged that conditions existed at the Rager Mountain Facility that posed an integrity risk to public safety, property, or the environment.  The NOPSO also proposed that certain corrective measures be taken to remedy the alleged conditions and ensure that the public, property, and the environment were protected from the potential risk.

53.      After good-faith discussions, a Consent Order was ultimately agreed to with PHMSA on May 25, 2023 settling all allegations in the NOPSO. *See attached as **Exhibit "D"** the May 25, 2023 Consent Order.*

54.      The May 25, 2023 Consent Order set forth, generally, *some* of following requirements for Equitrans:

a.   Completion of a root cause failure analysis;

b.   Submission of a remedial work plan with corrective measures;

c.   Review of records and procedures, including those involving construction, operation, maintenance and integrity management for the Rager Mountain Facility and to make those available to PHMSA;

d.   Conduct an assessment of personnel training;

e.  Submit an injection plan for PHMSA's approval;

f.  Upon returning to full operations, the Rager Mountain Facility could not exceed 80% of the actual operating pressure in effect immediately prior to the incident; and

g.  Submit monthly reports to PHMSA describing the repairs, remedial actions being undertaken, and the results of inspections.

55.  On February 13, 2026, PHMSA acknowledged by way of a "closure letter" that the terms of the May 25, 2023 Consent Order were complied with and, therefore, now closed with no further action contemplated.

56.  In addition, on April 14, 2026, another Consent Agreement was reached with PHMSA relating to the incident and on April 21, 2026, PHMSA issued a Consent Order.[3] *See attached as **Exhibit "E"** the April 21, 2026 Consent Order.*

57.  The April 21, 2026 Consent Order stems from PHMSA's October 17, 2025 Notice of Probable Violation and Proposed Civil Penalty for violations of 49 CFR Part 192.

58.  PHMSA and Equitrans met and agreed to a civil penalty in the amount of $466,550, in addition to completion of other compliance actions.

59.  The April 21, 2026 Consent Order provides that the parties agreed to the settlement of the proceeding to "avoid further administrative proceedings or litigation and will serve the public interest by promoting safety and protection of the environment…" April 21, 2026 Consent Order, pg. 2.

60.  Specifically, the April 21, 2026 Consent Order provides findings of violation for:

a.  49 CFR § 192.12(b)(2): failure to follow section 8, *Risk Management for Gas Storage Operations,* in API Recommended Practice 1171.

---

[3] The April 21, 2026 Consent Order mistakenly lists "EQT Production Company" as the party to the Order after EQT Corporation's acquisition of Equitrans Midstream Corporation in July 2024. However, Equitrans, L.P. has always operated the Rager Mountain Facility from the time of the incident to present day.

b. 49 CFR § 192.12(c): failure to follow its manual of written procedures for emergency preparedness and response activities.

61. The April 21, 2026 Consent Order also included compliance terms to resolve any ongoing concerns at the Rager Mountain Facility focused on response procedures, integrity issues, and lessons learned from the incident.

62. Despite the two Consent Orders and agreement reached between Equitrans and PHMSA – as the federal regulator with direct oversight of the Rager Mountain Facility and Well #2244 – the Commonwealth, through the Defendants, continue to proceed with criminal charges that are preempted by the federal PSA.

**E.    Statutory Background**

      **i. The Pipeline Safety Act Provides PHMSA with Exclusive Authority to Regulate the Safety of Interstate Pipelines**

63. The PSA, 49 U.S.C. § 60101 *et seq.*, directs the U.S. Department of Transportation ("USDOT") to promulgate federal safety standards for interstate natural gas pipelines and pipeline facilities. The PSA reflects the culmination of the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquid Pipeline Safety Act of 1979. P.L. 90-481, 82 Stat. 720, 90th Cong. (Aug. 12, 1968); P.L. 96-129, 93 Stat. 989, 96th Cong. (Nov. 30, 1979). The PSA has been amended several times including through the Protecting Our Infrastructure of Pipelines and Enhancing Safety ("PIPES") Act of 2016. P. L. 114-183, 130 Stat. 522, 114th Cong. (June 22, 2016) (effective December 23, 2016), which, among other things, directed PHMSA to establish minimum safety standards for natural gas storage facilities. 49 U.S.C. § 60141(a).

64. The PSA's express purpose is to create safety standards by "provid[ing] adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1).

65.    Thus, since 1968, USDOT has been charged with prescribing "minimum safety standards for pipeline transportation and for pipeline facilities." *Id.* § 60102(a)(2). Those minimum safety standards include "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." *Id.* § 60102(a)(2)(B).

66.    PHMSA is an agency within the USDOT created for the express purpose of maintaining "the highest degree of safety in pipeline transportation and hazardous materials transportation." 49 U.S.C. § 108(a)–(b). To this end, PHMSA is directed to "carry out . . . duties and powers related to pipeline and hazardous materials transportation and safety vested in the Secretary [of Transportation] by chapter[] . . . 601."[4]

67.    Pursuant to this authority, PHMSA administers a comprehensive nationwide pipeline safety program; it has prescribed and actively enforces federal safety standards that apply throughout the lifecycle of a "gas pipeline facility" (inclusive of facilities involved in the "gathering, transmission, or distribution of gas by pipeline, or the storage of gas, in interstate or foreign commerce"). 49 U.S.C. § 60101(a)(3), (a)(21)(A)(i). These safety standards include, among other things, requirements for materials, location, design, construction, testing, operations, maintenance, personnel qualification, public awareness, public safety, emergency response, and integrity management of gas pipeline facilities. *See generally* 49 U.S.C. § 60102(a), (d); 49 C.F.R. Parts 190, 191, 192 and 199.

68.    Under the PSA, PHMSA has ***exclusive*** authority over interstate gas pipeline facilities.

---

[4] The PSA is located within Chapter 601, Subtitle VIII of Title 49 of the U.S. Code.

69.     A "gas pipeline facility" includes "a pipeline, a right of way, a facility, a building, or equipment used in transporting or treating gas during its transportation."   49 U.S.C. § 60101(a)(3).

70.     "Transporting gas" is defined under the PSA as "the gathering, transmission, or distribution of gas by pipeline, *or the storage* of gas, in interstate or foreign commerce" (emphasis added). 49 U.S.C. § 60101(a)(21)(A)(i).

71.     And an "underground natural gas storage facility" is defined as any "gas pipeline facility that stores natural gas underground," including "(A) a depleted hydrocarbon reservoir; (B) an aquifer reservoir; or (C) a solution-mined salt cavern reservoir," as well as "injection, withdrawal, monitoring, and observation wells; wellbores and downhole components; wellheads and associated wellhead piping; wing-valve assemblies that isolate the wellhead from connected piping beyond the wing-valve assemblies; and any other equipment, facility, right-of-way, or building used in the underground storage of natural gas." *Id.* § 60101(a)(26); 49 C.F.R. § 192.3.

72.     The subject Well #2244 at-issue falls squarely within the definition of an underground natural gas storage facility.

73.     The PSA defines interstate broadly to include any "gas pipeline facility—(A) used to transport gas; and (B) subject to the jurisdiction of the [Federal Energy Regulatory] Commission under the Natural Gas Act [(the "NGA")]." *Id.* § 60101(a)(6).

74.     The NGA authorizes FERC "to regulate the transportation and sale of natural gas in interstate commerce." *New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 50 (D.C. Cir. 2024) (quoting *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019)); *see* 15 U.S.C. § 717(b).

### ii.    PHMSA's Enforcement Authority to Oversee Interstate Pipeline Compliance with the PSA

75.    Along with the comprehensive pipeline safety standards that Congress directed PHMSA to promulgate, the PSA also provides PHMSA with a broad spectrum of investigative and enforcement authorities.

76.    Under 49 U.S.C. §§ 60108(b) and 60117(d), PHMSA is empowered to, and tasked with, performing periodic inspections of interstate gas pipeline facilities, including underground natural gas storage facilities, covered under the PSA, the frequency of which is determined based on consideration of several factors such as the location, volume of material transported, and population characteristics of the surrounding area.

77.    Pursuant to this authority, PHMSA's pipeline safety regulations specify in more detail the scope and nature of its investigative activities at 49 C.F.R. § 190.203, which include facility inspections as well as requests for records or other information pertaining to the facility.

78.    If PHMSA determines that the information obtained from an inspection or other sources warrants further action, it may itself initiate one of several administrative enforcement proceedings specified under the PSA and its pipeline safety regulations. 49 C.F.R. §§ 190.205 190.206, 190.207, 190.233, and 190.239. These include, among other things, issuance of a Final Order that may issue civil penalties and impose injunctive measures via a compliance order, without having to file a civil action in court or refer the matter to the U.S. Department of Justice. 49 U.S.C. §§ 60118(b), 60122; 49 C.F.R. §§ 190.207, 190.213, 190.217, 190.221.

79.    In addition, PHMSA has separate authority to administratively order a pipeline operator to undertake measures in cases where it finds upon investigation that a particular pipeline facility would be "hazardous to life, property, or the environment" (Corrective Action Order (CAO)), has "conditions that pose a pipeline integrity risk to public safety, property of the

environment" (Safety Order), or has an unsafe condition or practice that "constitutes or is causing an imminent hazard" (Emergency Order). 49 U.S.C. §§ 60112, 60117(m); 49 C.F.R. §§ 190.233, 190.239, 190.236.

80. PHMSA may find one of the above standards to be met when, for example, it determines upon investigation that the facility has released gas in such a manner that is "hazardous to life, property, or the environment," or "has a condition or conditions that pose a pipeline integrity risk to public safety, property or the environment," with consideration of several factors including any "deteriorative qualities" associated with the gas. *See* 49 C.F.R. §§ 190.233(d) – (e), 190.239(a), (c) – (d).

81. These orders can impose a wide variety of injunctive measures that a pipeline operator must take, including suspended or restricted use of the facility, physical inspection, testing, repair, or other appropriate action to remedy the identified risk condition and abate potential harm to the public. 49 U.S.C. § 60112(d)(1); 49 C.F.R. § 190.233(a), 190.239(a). Unlike with a Final Order, PHMSA can issue these orders without having to make a finding of non-compliance with the pipeline safety regulations or the PSA.[5]

82. Finally, PHMSA may refer alleged criminal violations of the PSA to the U.S. Department of Justice. 49 U.S.C. § 60123; 49 C.F.R. § 190.291. And, it can refer noncompliance to the U.S. Department of Justice to file a civil action in federal court to seek injunctive relief as well as civil penalties and punitive damages. 49 U.S.C. § 60120(a); 49 C.F.R. § 190.235.

---

[5] Compare standards for issuance of a Notice of Probable Violation under 49 C.F.R. § 190.207(a) (requiring a statement "charging that person with a probable violation of 49 U.S.C. 60101 et seq. … or any regulation or order issued thereunder") with standards for issuance of Corrective Action Orders, Safety Orders, or Emergency Orders under 49 §§ 190.233, 190.239, and 190.236, respectively (which do not explicitly provide for a finding of violation as a condition precedent to issuance).

83. As set forth in detail above, PHMSA (as the federal regulator responsible for Well #2244) and Equitrans already entered into the two Consent Orders as a result of the incident.

84. Defendants' actions complained of herein contravene the results of those Consent Orders and cuts against the federal oversight vested to PHMSA.

### iii. The PSA's Express Preemption Provision Precludes State Pipeline Safety Standards for Interstate Pipelines

85. Against the backdrop of this comprehensive suite of pipeline safety standards and enforcement authority that is vested with PHMSA, the PSA contains an express preemption provision that, with one exception that does not apply here, preempts all actions by states to adopt or enforce safety standards for interstate pipeline facilities or transportation. *See* 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation").[6]

86. The legislative intent behind the PSA's preemption provision is to provide "national uniformity in the establishment and enforcement of … pipeline safety regulations." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 883 (9th Cir. 2006) (finding municipal pipeline safety standards preempted as applied to an interstate hazardous liquid pipeline).

87. And federal courts have consistently stated that the PSA's express preemption clause "precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." *Kinley Corp. v. Iowa Util. Bd., Util. Div., Dep't of Com.*, 999 F.2d 354, 359 (8th Cir. 1993); *see also United Gas Pipeline Co. v. Terrebonne Par. Police Jury*, 319 F. Supp. 1138, 1141 (E.D. La.

---

[6] The only exception is that a state may operate a one-call notification program, 49 U.S.C. § 60104(c), the requirements of which are specified under 49 U.S.C. § 60114, which generally requires states to adopt such program "that will notify an operator of a pipeline facility of activity in the vicinity of the facility that could threaten the safety of the facility." Pennsylvania's one-call program is established at 73 P.S. § 176 *et seq*. The Information does not allege any violation of the one-call program. The PSA's exception to express preemption over state pipeline safety standards for interstate pipeline facilities therefore does not apply in this case.

1970), *aff'd sub nom.* 445 F.2d 301 (5th Cir. 1971) ("Congress by completely pre-empting this area of interstate pipeline safety has specifically prohibited the states from doing anything in this regard."). The PSA is a sweeping exercise of express preemption, and it "expressly preempts state and local law in the field of safety." *Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 420 (4th Cir. 2013); *see also Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 211 (5th Cir. 2010) (noting that the PSA's predecessor statutes also "uniformly invalidated parochial safety provisions").

88.    Accordingly, the PSA precludes all state decision-making regarding safety standards as applied to interstate pipeline facilities (inclusive of underground natural gas storage facilities).

89.    Notably, preemption under the PSA occurs regardless of the compatibility of the state regulation to the federal regulation, or the degree to which the federal regulations apply to a particular facility.

90.    Nonetheless, it is worth noting that the federal pipeline safety regulations administered by PHMSA address substantially the same concerns and provide a comprehensive framework for addressing the safety and integrity of interstate underground natural gas storage facilities.

91.    Under the PSA, at § 192.12 "Underground natural gas storage facilities," provisions for well construction and operation to ensure that the ***integrity*** of the well are addressed at length.

92.    § 192.12 provides in relevant part:

(b) Depleted hydrocarbon and aquifer reservoir UNGSFs.

…

17

(2) *Each UNGSF that uses a depleted hydrocarbon reservoir or an aquifer reservoir for natural gas storage* and was constructed on or before July 18, 2017, *must meet the provisions of API RP 1171* (incorporated by reference, see § 192.7), sections 8, 9, 10, and 11, and paragraph (c) of this section, by January 18, 2018, and must meet all provisions of paragraph (d) of this section by March 13, 2021.

(c) Procedural manuals. Each operator of a UNGSF must prepare and follow for each facility one or more manuals of written procedures for conducting operations, maintenance, and emergency preparedness and response activities under paragraphs (a) and (b) of this section. Each operator must keep records necessary to administer such procedures and review and update these manuals at intervals not exceeding 15 months, but at least once each calendar year. Each operator must keep the appropriate parts of these manuals accessible at locations where UNGSF work is being performed. Each operator must have written procedures in place before commencing operations or beginning an activity not yet implemented.

(d) *Integrity management program —*

(1) *Integrity management program elements. The integrity management program for each UNGSF under this paragraph (d) must consist, at a minimum, of a framework developed under API RP 1171* (incorporated by reference, see § 192.7), section 8 ("Risk Management for Gas Storage Operations"), and that also describes how relevant decisions will be made and by whom. An operator must make continual improvements to the program and its execution. The integrity management program must include the following elements:

(i) A plan for developing and implementing each program element to meet the requirements of this section;

(ii) An outline of the procedures to be developed;

(iii) The roles and responsibilities of UNGSF staff assigned to develop and implement the procedures required by this paragraph (d);

(iv) A plan for how staff will be trained in awareness and application of the procedures required by this paragraph (d);

(v) Timelines for implementing each program element, including the risk analysis and baseline risk assessments; and

18

(vi) A plan for how to incorporate information gained from experience into the integrity management program on a continuous basis.

(2) *Integrity management baseline risk-assessment intervals.* No later than March 13, 2024, each UNGSF operator must complete the baseline risk assessments of all reservoirs and caverns, and at least 40% of the baseline risk assessments for each of its UNGSF wells (including wellhead assemblies), beginning with the highest-risk wells, as identified by the risk analysis process. No later than March 13, 2027, an operator must complete baseline risk assessments on all its wells (including wellhead assemblies). Operators may use prior risk assessments for a well as a baseline (or part of the baseline) risk assessment in implementing its initial integrity management program, so long as the prior assessments meet the requirements of API RP 1171 (incorporated by reference, see § 192.7), section 8, and continue to be relevant and valid for the current operating and environmental conditions. When evaluating prior risk-assessment results, operators must account for the growth and effects of indicated defects since the time the assessment was performed.

(3) *Integrity management re-assessment intervals*. *The operator must determine the appropriate interval for risk assessments under API RP 1171* (incorporated by reference, see § 192.7), subsection 8.6.2, and this paragraph (d) for each reservoir, cavern, and well, using the results from earlier assessments and updated risk analyses. The re-assessment interval for each reservoir, cavern, and well must not exceed seven years from the date of the baseline assessment for each reservoir, cavern, and well.

(4) *Integrity management procedures and recordkeeping*. Each UNGSF operator must establish and follow written procedures to carry out its integrity management program under API RP 1171 (incorporated by reference, see § 192.7), section 8 ("Risk Management for Gas Storage Operations"), and this paragraph (d). The operator must also maintain, for the useful life of the UNGSF, records that demonstrate compliance with the requirements of this paragraph (d). This includes records developed and used in support of any identification, calculation, amendment, modification, justification, deviation, and determination made, and any action taken to implement and evaluate any integrity management program element.

93.    Section 192.12 expressly incorporates API RP 1171, which, by its very title "Functional Integrity of Natural Gas Storage in Depleted Hydrocarbon Reservoirs and Aquifer Reservoirs" encompasses the purpose of Section 78.73(a) that the Commonwealth – through the Defendants – attempt to enforce against Equitrans.

19

94.     Equitrans and the Rager Mountain Facility are already subject to the provisions of API RP 1171.

95.     API RP 1171 focuses on functional integrity in design, construction, operation, monitoring, maintenance, and documentation practices and recommends that operators manage integrity through monitoring maintenance, and remediation practices and apply specific integrity assessment on a case by case basis. *See* API Recommended Practice 1171, First edition, September 2015.

96.     Those provisions address well casings, the use of safety devices and other risk management measures, and emergency response and preparedness. *See, e.g.,* Sections 6.3 (Well Casing), 6.4 (Casing Cementing Practices), 6.5 (Completion and Stimulation), 7.4 (Mechanical Integrity Monitoring), 8.0 (Risk Management for Gas Storage Operations), 8.4 (Threat and Hazard Identification and Analysis), 8.6 (Preventive and Mitigative Measures), 9.2 (Integrity Maintenance), 9.3 (Well Integrity Demonstration, Verification, and Monitoring), 10.6 (Emergency Preparedness/Emergency Response Plan), and 11.4 (Emergency Plans).

97.     Notably, API RP 1171 has specific requirements for functional integrity:

   a. in the design of natural gas storage reservoirs;

   b. of the natural gas storage reservoir and wells established and through initial attainment of maximum reservoir pressure and total inventory; and

   c. in the design and construction of natural gas storage wells.

*Id*. at Sections 5 through 7.

98.     API RP 1171 also specifically addresses:

   a. a detailed framework for considering, managing, and mitigating risks from potential threats and hazards associated with underground natural gas storage

operations, including, among other things, casing condition and inspection, pressure monitoring, corrosion monitoring, cement analysis and evaluation, subsurface and surface shut-off valve installation and inspection, and the need for remediation monitoring. *Id.* at Sections 8.4 to 8.6.1.

b. provisions on well inspection and monitoring, including the parameters monitored (such as shut-in well pressure) and the frequency of inspection, *Id.* at Sections 9.3.2, 9.6, as well as response procedures for integrity noncomformance. *Id.* at Section 9.7.

c. requirements for operators to "develop and implement a structured emergency preparedness/response plan in order to address accidental releases, equipment failures, natural disasters, and third-party emergencies."

99. The PSA's purpose is "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1).

100. It is PHMSA's job – not the various states' – to issue regulations establishing standards for and investigate the safety of interstate pipeline facilities. *See* 49 U.S.C. §§ 60101(a)(3), 60102(a)(2)(B). And that purpose is fulfilled by federal regulation of interstate pipeline facilities' safety – all state regulation in this domain is preempted. *See id.* § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."). PHMSA's primacy in this area is broad.

**iv.    Section 78.73(a) Purports to Regulate the Safety of Interstate Pipelines**

101. The at-issue subsection of Section 78.73(a) directs operators to "construct and operate the well in accordance with this chapter and ensure that the integrity of the well is

21

maintained and health, *safety*, and environment and property are protected." *See* 25 Pa. Code § 78.73(a).

102.    Indeed, safety is clearly contemplated by the plain language of the regulation in the context of well integrity, construction, and operation where Section 78.73(a) specifically states the word "safety" and is intended to ensure that "… safety [is] … protected." *See* 25 Pa. Code § 78.73(a).

103.    The very essence of Section 78.73(a) is to ensure safety in well integrity, construction, and operation through standards set by the Commonwealth.  This defies the purpose of the PSA and intrudes into an area not reserved for the states.

104.    The well construction, operation, and integrity management requirements in Section 78.73(a) would also clearly have a direct and substantial effect on safety of the Rager Mountain Facility if enforced by the Defendants, the DEP, and the Office of Attorney General.

105.    These DEP requirements would affect the safety of the Rager Mountain Facility because section 9 of API RP 1171 addresses integrity demonstration, verification, and monitoring practices and section 11 provides requirements for integrity and risk management. *See, e.g., §* 11.8.1 ("the operator should establish procedures to manage and maintain integrity of storage wells and reservoirs in accordance with the requirements of other sections of this standard.").

106.    Equitrans is charged with violating Section 78.73(a) despite the regulation being expressly preempted by the PSA that already addresses those subjects.

107.    Several courts have found that state laws similar to Section 78.73(a) were preempted by the PSA.  *see, e.g. Colorado Interstate Gas Co. v. Wright*, 707 F. Supp. 2d 1169 (D. Kan. 2010); *United Gas Pipeline Co. v. Terrebonne Par. Police Jury,* 319 F. Supp. 1138 (E.D. La. 1970), *aff'd sub nom*. 445 F.2d 301 (5th Cir. 1971); *ANR Pipeline Co. v. Iowa State Commerce*

*Commission*, 828 F.2d 465 (8th Cir. 1987); and *Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 669 (8th Cir. 2025).

108.    Here, there is no doubt that Section 78.73(a) is preempted by the PSA and that enforcement of it against Equitrans is improper.

> **v.   Section 78.73(a) Is Impliedly Preempted Because The Pervasiveness of Federal Regulation Demonstrates that Congress Intended to Occupy the Field of Pipeline Safety Regulation**

109.    Section 78.73(a) is also impliedly preempted by federal law because through the PSA, Congress required the USDOT to promulgate extensive federal safety standards for interstate natural gas pipelines and pipeline facilities. A few provisions of the PSA are worth noting:

(1)    Congress's express purpose in passing the PSA was to create safety standards that "adequate[ly] protect[ed] against risks to life and property posed by pipeline transportation and pipeline facilities," 49 U.S.C. § 60102(a)(1);

(2)    PHMSA – a division within USDOT – is in charge of all minimum safety standards related to, among other areas, the design, inspection, emergency plans and procedures, operation, and maintenance of pipeline facilities, and it has exclusive authority over interstate pipeline facilities, *id.* §§ 60101(a)(3), 60102(a)(2)(B);

(3)    PHMSA can and does actively enforce its safety standards for pipeline facilities, *id.* § 60101(a)(3), (a)(2)(A)(i); *see also generally* 49 C.F.R. Parts 190, 191, 192, 199; and

(4)    The PIPES Act, passed in 2016, directed PHMSA to establish minimum safety standards for natural gas storage facilities. *Id.* § 60141(a).

110.    This breadth of authority provided to PHMSA demonstrates that Congress "inten[ded] to occupy a given field to the exclusion of state law." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988). A field-preemptive purpose "may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the

23

federal law and the character of obligations imposed by it reveal the same purpose.'" *Id.* (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). When field preemption exists, "actual conflict between a challenged state enactment and relevant federal law is unnecessary to a finding of field preemption; instead, it is the mere fact of intrusion that offends the Supremacy Clause." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016).

111.    Several courts have concluded that the PSA and its predecessor – the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") – preempted the field of safety regarding the storage and interstate transmission of gas by pipeline. Indeed, the primacy of federal law in this area is not new. *See e.g., Tenneco Inc. v. Public Service Commission of West Virginia*, 489 F.2d 334 (4th Cir. 1973); *Colorado Interstate Gas*; *United Gas Pipeline*; and *United Steelworkers of America, Local 12431 v. Skinner*, 768 F. Supp. 30 (D.R.I. 1991).

112.    The breadth of the PSA and the requirements for PHMSA to develop regulations for the purpose of safety to life and property[7] demonstrate that the PSA has occupied the field in terms of anything related to safety. And Section 78.73(a) encroaches on that exclusive federal authority by allowing the Defendants to second-guess any determinations made by and/or agreements reached with PHMSA.

113.    The Defendants cannot do that. The Court should find that, to the extent Section 78.73(a) is not expressly preempted by federal law, it is impliedly preempted because federal regulation occupies the entire field of safety for interstate pipeline facilities.

---

[7] *See* 49 U.S.C. § 60102(a)(1).

## REQUISITES FOR RELIEF

114.    As a result of Defendants' conduct described above, there is an imminent likelihood that Defendants' actions have violated and will continue to violate the Supremacy Clause of the U.S. Constitution and subject Equitrans to irreparable harm.

115.    An actual and substantial controversy exists between Equitrans and Defendants as to their respective legal rights and duties. The conduct of Defendants, as alleged herein, have and will result in irreparable injury to Equitrans, including but not limited to potential criminal liability, economic hardship, impairment of existing business relationships, and a loss of goodwill.

116.    This is also the **_second_** state criminal matter brought by the Commonwealth – through the Defendants – involving Equitrans' purported violation of Chapter 78 of Title 25 of the Pennsylvania Code.[8]

117.    Equitrans cannot be subjected to another state criminal case where the criminal charge is again premised upon a preempted regulation.

118.    Equitrans is further harmed having already entered into two Consent Orders with its federal regulator, PHMSA.

119.    Despite this, Equitrans is still being subjected to separate state standards that interfere with Equitrans' ability to work with PHMSA for fear of state prosecution resulting from the same issue.

120.    And while there is an ongoing state criminal proceeding that is pending in Cambria County, Pennsylvania, *this Court* is in the best position to prevent the irreparable injury faced by Equitrans in answering the federal preemption question at-issue.

---

[8] The Commonwealth, through the Defendants, has also charged Equitrans with a felony for violating, in part, 25 Pa. Code § 78.89 in *Comm. v. Equitrans, L.P.* (No. CP-30-CR-0000204-2024) presently pending in the Greene County Court of Common Pleas. That matter is presently on appeal to the Commonwealth Court of Pennsylvania for similar preemption issues.

121.    Indeed, "preemption claims are essentially ones of federal policy, so that the federal courts are particularly appropriate bodies for the application of preemption principles." *Natl. Parks Conservation Ass'n v. Lower Providence Tp., Pa.,* 608 F. Supp. 2d 637, 651 (E.D. Pa. 2009) (citing *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 307-308 (3d Cir. 2004)).

122.    The preemption claim here focuses on the strong federal interest to oversee facilities such as the Rager Mountain Facility – a facility that PHMSA has complete safety oversight of as expressly set forth in the PSA.  The Defendants and the Commonwealth's interest in this field is, by all means, trumped by the federal government's interest.

123.    In fact, federal enforcement by PHMSA that led to the Consent Orders sufficiently evidences the federal government's legitimate interest in the field that Congress expressly preempted.

124.    Moreover, enforcement of state criminal charges is not a significant state interest where there has already been federal enforcement by the federal regulator responsible for the subject facility – here PHMSA and the Consent Orders.

125.    There is no legitimate state interest where the attempted enforcement is patently unconstitutional and violates the Supremacy Clause.

126.    There is also no greater irreparable harm or extraordinary circumstance that Equitrans can face than exposure to state criminal liability for an alleged crime that – at its core – is preempted and not cognizable under the law.

127.    Equitrans has no plain, speedy, or adequate remedy at law to address the wrongs described herein.

128.    Indeed, Equitrans faces a "significant risk that it will experience harm that cannot adequately be compensated after the fact by monetary damages" if the Defendants proceed with

26

the criminal charges under Section 78.73(a).  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).

129.    And here, a balance of the equities and the public interest both weigh in favor of injunctive relief.

130.    First, there is no threat of public harm or environmental injury where Well #2244 has already been plugged and Equitrans entered into two detailed Consent Orders with its federal regulator relating to the incident.

131.    Second, Congress has explicitly determined that facilities, such as the Rager Mountain Facility, are governed by the PSA and its express preemption provision.

132.    By doing so, Congress has determined that it is in the public interest to preempt enforcement of regulations like Section 78.73(a) at issue and finding in favor of Equitrans simply promotes that directive.

133.    Equitrans therefore seeks declaratory and injunctive relief restraining Defendants from enforcing a Pennsylvania regulation that is preempted and interferes with Equitrans' business as described herein.

**COUNT I: Declaratory Relief – Preemption / *Ex Parte Young* Action**
**Plaintiff v. All Defendants**

134.    Equitrans incorporates all prior paragraphs by reference.

135.    The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

136.   The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

137.   Congress made clear through an express preemption provision that states, such as the Commonwealth, cannot adopt or enforce their own safety standards for interstate pipeline facilities or transportation as Defendants are attempting to do to Equitrans through enforcement of Section 78.73(a). *See* 49 U.S.C. § 60104(c) (*Preemption*).

138.   Equitrans is legally entitled to file an *Ex Parte Young*[9] action to prevent state law officials from acting in a way that violates a federal statute.

139.   The US Supreme Court in *Armstrong v. Exceptional Child Center*, 575 U.S. 320 (2015), as well as other courts interpreting *Armstrong,* specifically recognize that the *Ex Parte Young* exception still applies in this context. *See Armstrong* (recognizing that courts have long granted injunctive relief against "state officials who are violating, or planning to violate, federal law").

140.   As such, Defendants' attempted, and ongoing, enforcement of Section 78.73(a) against Equitrans – as a criminal violation – is impermissible as it intrudes on the PSA and the exclusive authority provided to PHMSA to oversee and regulate Equitrans and Well #2244.

141.   Since Section 78.73(a) regulates the same conduct already overseen by PHMSA, it therefore violates the PSA and the exclusive preemption provision.

142.   Here, federal law either expressly preempts or occupies the entire field of interstate gas pipeline facilities, including the Rager Mountain Facility and Well #2244, resulting in the actions taken by Defendants as being preempted under the Supremacy Clause.

---

[9] *Ex parte Young*, 209 U.S. 123 (1908).

143.    Defendants may not enforce Section 78.73(a) against Equitrans and the criminal charge must be dismissed.

## COUNT II: Preliminary Injunctive Relief
### Plaintiff v. All Defendants

144.    Equitrans incorporates all prior paragraphs by reference.

145.    Defendants' actions have caused and are causing immediate and irreparable harm that cannot adequately be compensated by monetary damages.

146.    There is good cause to believe that Equitrans will succeed on the merits of its claim.

147.    Unless Defendants are immediately enjoined from enforcing 25 Pa. Code § 78.73(a), and any other similar Commonwealth law against Equitrans, Defendants can reasonably be expected to continue the misconduct described herein.

148.    Equitrans is suffering and continues to suffer injury greater than any that would result to Defendants from this Court granting preliminary injunctive relief.

149.    The harm experienced by Equitrans outweighs any harm that will result to Defendants as a result of a preliminary injunction preventing Defendants from enforcing 25 Pa. Code § 78.73(a) and any other similar Commonwealth law against Equitrans.

150.    The public interest favors preliminary injunctive relief because the public has a strong interest in the supremacy and uniform application of federal law and in preventing unlawful state enforcement actions.

151.    The issuance of the preliminary relief will restore the parties to their status as it existed immediately prior to the wrongdoing alleged herein.

## COUNT III: Permanent Injunctive Relief
### Plaintiff v. All Defendants

152.    Equitrans incorporates all prior paragraphs by reference.

29

153.   Defendants' actions have caused and are causing immediate and irreparable harm that cannot adequately be compensated by monetary damages.

154.   Equitrans is suffering and continues to suffer injury greater than any that would result to Defendants from this Court granting injunctive relief.

155.   Specifically, Defendants continue to enforce 25 Pa. Code § 78.73(a) against Equitrans.

156.   The balance of hardships and the public interest favor entry of a permanent injunction because Defendants have no lawful interest in enforcing a preempted state regulation – 25 Pa. Code § 78.73(a) – and the public interest is served by ensuring compliance with federal law and preventing unlawful enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Equitrans requests that judgment be entered in its favor and against Defendants as follows:

1. Enter judgment declaring that enforcement of 25 Pa. Code § 78.73(a) and any other similar Commonwealth law violates the Supremacy Clause of the United States Constitution as applied to Equitrans, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction that prohibits Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 25 Pa. Code § 78.73(a) and any other similar Commonwealth law against Equitrans.

3. Any other relief within this Court's discretion that it deems just and proper.

Dated: July 31, 2026

Respectfully submitted,

CLARK HILL PLC

*/s/ Robert J. Ridge*
Robert J. Ridge, Esquire
Bryon M. Chowka, Esquire
Clark Hill, PLC
301 Grant Street, 14th Floor
One Oxford Centre
Pittsburgh, PA  15219

Christopher M. Capozzi, Esquire
Christopher M. Capozzi, Attorney-At-Law, PC
100 Ross Street, Suite 340
Pittsburgh, PA 15219

***Counsel for Equitrans, L.P.***